# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-3028EM

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | On Appeal from the |
| v. | * | United States District Court |
| | * | for the Eastern District of |
| | * | Missouri. |
| Anthony Tucker, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: February 12, 2002

Filed: April 11, 2002 (Corrected: 4/19/02)

_____

Before BOWMAN, RICHARD S. ARNOLD, and WOLLMAN, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.

Anthony Tucker was charged with committing bank fraud, in violation of 18 U.S.C. §§ 2, 1344(1) and (2). Mr. Tucker pleaded guilty, admitting that he had cashed one counterfeit check in the amount of $1,206.15 at an FDIC-insured bank. The District Court sentenced him to eighteen months of imprisonment and ordered him to pay restitution in the amount of $116,015.30. Mr. Tucker appeals his sentence and the Court's restitution order.

Mr. Tucker makes several arguments in his appeal: first, that the District Court erred in determining that he was a leader or organizer of five or more people in the check-cashing scheme, for which the Court imposed a four-point sentencing enhancement; second, that the Court erred in finding him accountable for a loss of funds of at least $70,000, and as a consequence imposed a six-point sentencing enhancement; and third, that the Court incorrectly ordered him to pay restitution in the amount of $116,015.30. Mr. Tucker contends that the evidence presented at the sentencing hearing consisted mostly of hearsay and was not reliable enough to support the sentence and restitution order imposed by the District Court.

We affirm, with a minor exception.

I.

The defendant pleaded guilty to one count of bank fraud in violation of 18 U.S.C. §§ 2, 1344(1) and (2). Under the United States Sentencing Guidelines, this offense has a base offense level of six. Mr. Tucker's Pre-Sentence Report (PSR) concluded that he also organized and led a conspiracy to cash or attempt to cash counterfeit checks that resulted in bank losses aggregating $116,015.30. His PSR suggested a four-level enhancement for his role as an organizer or leader in criminal activity which involved five or more participants, and a six-level sentencing enhancement because the offense resulted in a loss of more than $70,000 but less than $120,000. U.S.S.G. § 2F1.1(b)(2)(A) and (B) and § 2F1.1(b)(1)(G). Mr. Tucker objected to the government's relevant-conduct findings. He acknowledged that he was responsible for a loss of $17,146.29, but contested the additional $98,869.01.[1] Defendant also claimed that he was a minor participant in the bank-fraud scheme and should therefore receive a two-point downward departure.

---

[1]Defendant acknowledged his involvement with Sharon Jones and Joseph Blackwell, causing a loss of $17,146.29. Applt. Brief at 19.

A sentencing hearing was held to determine defendant's role in the offense and the loss attributable to him. The evidence presented at the sentencing hearing indicates that there were five accounts on which counterfeit checks were drawn in the scheme. These include: sixteen checks drawn on the account of ATKearney, totaling $29,994.53; twelve checks drawn on the account of Castle Metals, totaling $21,781.27; seventeen checks drawn on the account of Follett Educational Services, totaling $22,540.62; fourteen checks drawn on the account of United Rentals, totaling $24,713.73; and twelve checks drawn on the account of Waste Management, totaling $16,985.15. The evidence presented also implicated the following individuals: Joseph Blackwell, Crystal Conaway, Robert Cole, Terrance Esters, Arnetta Giles, Donald Harris, James Johnson, Sharon Jones, Debra Powers, Steven Smith, Anthony Tucker, and Tita Vaughn.

The government called two witnesses, Sharon Jones, a co-defendant of Mr. Tucker,[2] and FBI Special Agent David Rizi, the investigator of the bank fraud scheme that led to the indictment of Mr. Tucker and Ms. Jones, as well as Mr. Cole, Ms. Conaway, Mr. Harris, Ms. Hayes, and Mr. Johnson.

Ms. Jones testified that she received a total of seven checks from defendant totaling $12,481.88. Sent. Tr. 5. Six of these checks were drawn on the account of United Rentals, and one was drawn on the account of Follett Educational Services. She stated that Mr. Tucker contacted her and, after meeting with her, discussed the mechanics of the counterfeit-check-cashing scheme. She allegedly cashed the checks for Mr. Tucker on two different occasions. Both times, defendant drove Ms. Jones

---

[2]Ms. Jones pleaded guilty to bank fraud in violation of 18 U.S.C. § 1344.

to the various banks to cash the checks.[3]  After she did so, Mr. Tucker paid her $500 for negotiating the seven checks.

Ms. Jones further testified to the involvement of various other individuals in the check-cashing scheme.  The first person that she implicated was Donald Harris, a cousin of defendant.  She stated that she overheard a conversation between defendant and Mr. Harris in which they discussed cashing checks.  Because this conversation took place over the phone, Ms. Johnson heard only Mr. Tucker's side of the conversation.  Supposedly, there was a discussion about taking a female's identification into a bank.  However, Ms. Jones was unable to provide any other details of Mr. Harris's involvement.

Next, Ms. Jones testified to the involvement of Joseph Blackwell and Robert Cole.  According to Ms. Jones's testimony, Mr. Blackwell and Mr. Cole told Ms. Jones that they had also "cashed some checks" for Mr. Tucker.  Sent. Tr. 10-11.  The only other person that Ms. Jones allegedly knew was involved with the check-cashing scheme was Terrance Esters, another cousin of Mr. Tucker's.  Ms. Jones testified that defendant told her that he had a "source inside the Bank of America," and that "it was his cousin."  Sent. Tr. 12.

The next witness to testify at the sentencing hearing was Special Agent Rizi.  Like Ms. Johnson, he testified to the involvement of several individuals in the check-cashing scheme.

---

[3]Ms. Jones did state that another person by the name of Tyree was with Mr. Tucker on one of these occasions.  She stated that he also had some checks, and that they were the same type of checks that she was given.  However, she did not know if he received the checks from Mr. Tucker or if he cashed the checks while with Mr. Tucker.

Agent Rizi first described his interview of Tita Vaughn. Ms. Vaughn, the agent testified, became familiar with the scheme because of the involvement of Cassaundra Hayes. Ms. Vaughn told Agent Rizi that she asked to accompany Ms. Hayes and Tyree Lockett to several banks to cash a few checks on one occasion. Ms. Vaughn said that she was contacted by Mr. Lockett, and she told him that "she wanted to get involved in what [Ms. Hayes] was involved in." Sent. Tr. 48. Mr. Lockett recorded her telephone number and address. Then Ms. Vaughn was contacted by Mr. Tucker to discuss the mechanics of the check-cashing scheme and her compensation. Ms. Vaughn told Agent Rizi that she was supposed to get half of the amount of the first check. Ms. Vaughn stated that she then received a check from someone by the name of "James" and attempted to cash it at a Bank of America branch.[4] Sent. Tr. 44-45. However, she was arrested when attempting to cash this check, which was drawn on the account of United Rentals for the amount of $1,808.42.

Agent Rizi then testified about his interview with Cassaundra Hayes. Agent Rizi testified that Ms. Hayes was approached by Mr. Tucker and a friend of his by the name of "John," and that Mr. Tucker organized a "deal" in which Ms. Hayes would take part in the check-cashing scheme. Sent. Tr. 51. Ms. Hayes cashed seven checks totaling $11,840.91 and attempted to cash another in the amount of $1,057.09. Four of these checks were drawn on the account of Waste Management, including the attempt, and the other three were drawn on the account of United Rentals.

Next, Agent Rizi described his interview with Joseph Blackwell. Mr. Blackwell told Agent Rizi that he cashed three checks totaling $4,662.76, drawn on the account of Follett Educational Services. He said that he received the checks from

---

[4]During the course of Agent Rizi's investigation, he discovered that "James" was actually Donald Harris. Mr. Harris also drove Ms. Vaughn to the bank to cash the counterfeit check.

Mr. Tucker.[5]  Mr. Blackwell also stated that he was aware that Sharon Jones was involved in the "check ring bank fraud."  Sent. Tr. 55.

Agent Rizi also testified to the contents of Mr. Tucker's residence that were discovered during the execution of a search warrant.  Agent Rizi found a logo for United Rentals on Mr. Tucker's computer.[6]  He testified that this logo was probably downloaded from the internet during December 2000.  However, Agent Rizi could not establish that any of the checks were printed at Mr. Tucker's residence.  He did not find any software used to reproduce the series of numbers printed on the bottoms of checks nor did he discover any "check stock" (paper) on which the checks could have been printed.  Sent. Tr. 80.  Agent Rizi did find a piece of paper that contained the name, telephone number, and address of Ms. Vaughn in Mr. Tucker's wallet.  He also discovered $1,000 cash in Mr. Tucker's home.

Mr. Tucker's cellular telephone records were also analyzed at the sentencing hearing.  Agent Rizi testified as to the contents of the records.  The telephone records cover the time period beginning November 1, 2000, and ending January 16, 2001.  Sent. Tr. 58.  The records indicate that during this time Mr. Tucker either received calls from or made calls to Mr. Esters, Mr. Harris, Ms. Hayes, Ms. Jones, Mr. Smith, and Ms. Vaughn.[7]  The dates that these phone calls were made coincide with the dates

---

[5]Mr. Blackwell also told Agent Rizi that Donald Harris threatened him and told him not to tell anyone about the checks.   He did not state that Mr. Tucker sent Mr. Harris.  This incident occurred after the indictment of Mr. Tucker.

[6]Fourteen checks of the checks involved in the bank fraud scheme, including two attempts, were drawn on the account of United Rentals.  These checks totaled $24,713.73.

[7]There were six calls made to Mr. Esters's then current residence, nineteen calls to Mr. Harris, twenty-seven calls to Ms. Hayes, thirty-nine calls to Ms. Jones, two calls to Mr. Smith, and five calls to Ms. Vaughn.  The records indicate that no phone calls were ever made to or received by the following individuals: Joseph Blackwell, Crystal Conaway, Arnetta Giles, James Johnson, and Debra Powers.

that these individuals cashed the checks at issue in the bank-fraud scheme. Sent. Tr. 59-60.

At the conclusion of the sentencing hearing, Mr. Tucker was sentenced to eighteen months of imprisonment and ordered to pay restitution in the amount of $116,015.30.

## II.

Mr. Tucker contends that the evidence presented at the sentencing hearing consisted mostly of hearsay and was not reliable enough to support his sentence and restitution order. We review the Court's findings on relevant conduct for clear error only. United States v. Balano, 8 F.3d 629, 630 (8th Cir. 1993).

First, defendant argues that the District Court clearly erred in determining that he was a leader or organizer of five or more individuals in the check-cashing scheme, a finding which resulted in a four-point sentencing enhancement. Instead, defendant argues that he was only a minimal participant in the scheme and that he should have received a downward departure from his sentence.

The sentencing enhancement for defendant's role as a leader or organizer in the check-cashing scheme was based primarily on the testimony of Ms. Jones and Agent Rizi. Defendant contends that their testimony was based on statements made by others and should have been excluded following the hearsay objections made to the testimony.

Hearsay is admissible in sentencing hearings. United State v. Wise, 976 F.2d 393, 401-03 (8th Cir. 1992), cert. denied, 507 U.S. 989 (1993). Additionally, a sentence based on hearsay will be sustained if the testimony is reliable enough. See U.S. Sentencing Guidelines Manual § 6A1.3(a) (2000) (courts may consider evidence

which might be inadmissible at other proceedings if information has "sufficient indicia of reliability").

Two individuals testified at the sentencing hearing to Mr. Tucker's role in the offense. First, Ms. Jones stated that she received and cashed checks for Mr. Tucker. She then testified to the involvement of Mr. Harris, Mr. Blackwell, Mr. Cole, and Mr. Esters. Much of this testimony was corroborated by Agent Rizi, who also stated that Mr. Blackwell and Ms. Jones were involved in the offense. Additionally, Agent Rizi testified to the involvement of Ms. Vaughn and Ms. Hayes. His testimony was based on various interviews he conducted with the above-named individuals during his investigation of the bank fraud scheme. Many of these statements were made against these individuals' penal interests. Therefore, we cannot agree that the evidence presented was not reliable enough to support his sentence.

After close analysis, we hold that the District Court did not clearly err in determining that defendant's role in the offense was that of a leader or organizer of five or more individuals. By defendant's own admission, he is responsible for the actions of two others, Ms. Jones and Mr. Blackwell. Ms. Jones and Agent Rizi testified to at least four other individuals' involvement in the scheme. According to their testimony, Ms. Jones, Mr. Blackwell, Mr. Cole, and Ms. Hayes also received checks directly from defendant. Additionally, though Ms. Vaughn did not receive a check directly from defendant, it was he who contacted her about the check-cashing scheme and the method of payment for her services. Following this investigation, three of these individuals, Mr. Harris, Mr. Cole, and Ms. Hayes, were indicted for bank fraud in violation of 18 U.S.C. § 1344. Moreover, Mr. Tucker's cellular telephone records also suggest that he was in contact with one Steve Smith.[8] Therefore, the District Court's finding that defendant was a leader of five or more individuals was not clearly erroneous.

---

[8]Mr. Smith is allegedly responsible for $2,506.27.

Defendant's second argument is that the District Court erred in determining that he was responsible for a loss of funds of at least $70,000 but less than $120,000 for which the Court imposed a six-point sentencing enhancement. Again, defendant contends that the evidence presented at the sentencing hearing consisted mainly of hearsay and lacked the indicia of reliability needed to support his sentence. We disagree.

By Mr. Tucker's own admission, he is responsible for the loss of at least $17,146.29 drawn on the accounts of Waste Management, Follett Educational Services, and United Rentals.[9] Testimony presented at the sentencing hearing showed that defendant also supplied checks to two other individuals, Mr. Cole and Ms. Hayes, totaling a loss of $25,407.10. These two individuals cashed checks, or attempted to cash checks, drawn on the accounts of ATKearney, Castle Metals, United Rentals, and Waste Management. Significantly, all checks involved in the scheme were drawn on one of these five checking accounts: Waste Management, Follett Educational Services, Castle Metals, ATKearney, and United Metals, and Mr. Tucker was the source for at least one counterfeit check drawn on each of these five accounts. Additionally, the logo for United Rentals was found on Mr. Tucker's home computer. The loss attributable to counterfeit checks drawn on this account alone totals $24,713.73. Mr. Tucker's cellular telephone records also indicate that he had telephone contact with at least four other individuals also involved in the scheme, Mr. Esters, Mr. Harris, Mr. Smith, and Ms. Vaughn. The District Court did not clearly err in finding defendant responsible for at least $70,000. Because the evidence presented at the sentencing hearing was sufficiently reliable to uphold Mr. Tucker's sentence, we affirm the six-point sentencing enhancement based on the amount of loss attributable to him.

---

[9]This figure includes the check that Mr. Tucker cashed for $1,206.15 drawn on the account of Waste Management, the checks that Ms. Jones cashed for $12,481.88 drawn on Follett Educational Services and United Rentals, and the checks that Mr. Blackwell cashed for $4,662.76 drawn on Follett Educational Services.

Mr. Tucker's final argument is that the District Court erred in ordering him to pay restitution in the amount of $116,015.30. Defendant is responsible for his own check-cashing activity, as well as that of Ms. Jones and Mr. Blackwell, by his own admission. This totals $17,146.29. He also should be held responsible for checks cashed by Mr. Cole and Ms. Hayes, because he allegedly provided them with counterfeit checks. These checks total $25,407.10. Additionally, because the logo for United Rentals was found on defendant's computer, it was not error to hold defendant responsible for all checks drawn on the United Rental account. These total $24,713.73.[10] Defendant also had telephone contact with Mr. Esters, Mr. Harris, Mr. Smith, and Ms. Vaughn. The amount of checks cashed by these persons totals $11,636.90. We cannot say that it was clear error for the Court to attribute this amount to Mr. Tucker.

Four other individuals cashed checks drawn on one of the five bank accounts involved. These persons are Crystal Conaway, Arnetta Giles, James Johnson, and Debra Powers. No testimony at the sentencing hearing indicated direct contact between them and defendant. They are responsible for this loss of $60,620.51. Four checks cashed by Mr. Johnson were drawn on the account of United Rentals, whose logo was found on defendant's home computer. Given this connection between the two parties, it was not clear error for the Court below to conclude that Mr. Tucker was responsible for Mr. Johnson's check-cashing activity, which totals $14,232.75.

Ms. Conaway received checks from defendant's brother and sister-in-law, and Ms. Powers received checks from Mr. Harris. Although defendant has not been charged with conspiracy, he is responsible for all relevant conduct, the definition of which includes check cashing reasonably foreseeable by him as part of the overall scheme. U.S.S.G. § 1B1.3(a) (2000). The inferences are substantial, though not compelling, that defendant was connected with all of the checks as to which the

---

[10]However, when compiling the total loss attributable to Mr. Tucker for the restitution order, the entire amount of $24,713.73 drawn on United Rentals has been accounted for in the calculations of loss per person.

District Court heard testimony, except Mr. Tucker should not be held responsible for the actions of Ms. Giles. There is no evidence that defendant had any contact with her, by telephone or otherwise. She was responsible for a loss of $5,707.29. Because this amount is not de minimis, the restitution order should be reduced by $5,707.29.

Accordingly, the sentence is affirmed, and the restitution order is reduced by $5,707.29.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.