**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 18 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

DALE WALTER OSBORNE,

      Defendant - Appellant,

No. 02-4119

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

DARRELL WAYNE REESE,

      Defendant - Appellant,

No. 02-4167

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

BRAD LEE GORDON,

      Defendant - Appellant.

No. 02-4171

**Appeals from the United States District Court
for the District of Utah
(D.C. No. 01-CR-742)**

Submitted on the briefs:[*]

G. Fred Metos, Salt Lake City, Utah for Defendant-Appellant Dale W. Osborne.

Julie George, Salt Lake City, Utah for Defendant-Appellant Brad Lee Gordon.

Robert Breeze, Salt Lake City, Utah for Defendant-Appellant Darrell Wayne Reese.

Paul M. Warner, United States Attorney, and Diana Hagen, Assistant United States Attorney, Salt Lake City, Utah for the Plaintiff-Appellee United States of America.

Before **KELLY**, **BRISCOE**, and **LUCERO**, Circuit Judges.

**LUCERO**, Circuit Judge.

Each defendant, Dale Walter Osborne, Darrell Wayne Reese, and Brad Lee Gordon, pled guilty to one count of bank fraud in violation of 18 U.S.C. § 1344, in connection with a check-counterfeiting scheme. All defendants appeal their sentences, arguing that the district court erred in calculating the amount of loss for the purpose of determining relevant conduct. Because these appeals arise

---

[*] At the parties' request, the case is unanimously ordered submitted without oral argument pursuant to Fed. R. App. P. 34(f) and 10th Cir. R. 34.1(G).

from common facts and raise similar arguments, we consolidate them for disposition. Exercising jurisdiction under 28 U.S.C. § 1291, and 18 U.S.C. § 3742(a), we affirm.

## I

Defendants were involved in a three-tiered check-counterfeiting scheme that operated from January 2001 until November 2001. Gordon and his girlfriend, Candice Eppard, were known as the "bosses" of the organization. (2 Osborne R. at 6.) They employed Osborne, Reese, and others as "front-runners," who in turn recruited "cashers." (2 id. at 7–8.) Testifying as a government witness, Eppard explained that front-runners acted as buffers between cashers and bosses, to protect the bosses in the event a casher was apprehended.

The organization worked as follows. Individuals stole checks from the mail and gave them to the bosses. Using a computer program, the bosses would scan the stolen checks, alter the payee and amount, and print counterfeit checks. Although only thirty percent of the stolen checks were usable for counterfeiting, the bosses would counterfeit a single stolen check several times, and increase the amount payable in multiples of up to forty times the original amount. Unused stolen and counterfeit checks were destroyed.

Front-runners provided the bosses with the names of their cashers, to be printed as the payee on the counterfeit check. Once produced, the bosses handed

the counterfeit checks to the front-runners, who in turn gave them to cashers to tender at banks. Upon negotiating a check, the casher gave the proceeds to the front-runner, who kept a third for himself, gave a third to the casher, and gave a third to the bosses. Front-runners operated independent cells. They retained discretion to hire their own cashers and chose the banks where the checks would be tendered, and they did not pool their proceeds. Nonetheless, they generally knew the other front-runners in the operation and knew that they were all involved in the same scheme. Osborne, in his capacity as a front-runner, employed three cashers, who obtained a total of $45,325 for the organization by negotiating counterfeit checks. Reese, another front-runner, did not join the organization until after August 6, 2001. He primarily employed only one casher although he sometimes worked with two others. Eppard testified that Reese also assisted in stealing checks from the mail in September 2001.

The scheme ended abruptly when the bosses, Eppard and Gordon, were arrested on November 29, 2001. During its operation, the organization obtained proceeds totaling $157,019 from counterfeit checks. After arresting Eppard and Gordon, the police found in their home stolen and counterfeit checks, with face values totaling $708,519. Some of these checks were defective and unusable.

Gordon, Eppard, Osborne, Reese, and another front-runner were charged with one count of conspiracy in violation of 18 U.S.C. § 371, one count of bank

fraud in violation of 18 U.S.C. § 1344, and one count of mail theft in violation of 18 U.S.C. § 1708. In addition, Gordon and Eppard were charged with one count of passing counterfeit checks kept in their possession in violation of 18 U.S.C. § 472, and one count of possession of counterfeit checks in violation of 18 U.S.C. § 513. Gordon, Osborne, and Reese each pled guilty to the bank-fraud count, and the remainder of the charges were dismissed.

At sentencing, after hearing testimony from Eppard and Postal Inspector Randy Griffin, the district court concluded that the intended loss for the entire organization totaled over $825,000, reflecting (1) actual losses of $157,019 obtained from counterfeit checks during the length of the operation, in addition to (2) potential losses of $708,519, the face value of stolen and counterfeit checks seized from the Gordon-Eppard residence, minus $40,000, the estimated value of the unusable checks found discarded outside their former residence.

Based on this calculation of loss, the sentencing court enhanced the criminal offense level for each defendant. Gordon and Osborne were severally held accountable for the intended loss of the entire organization—approximately $825,000. Reese, on the other hand, had not entered the organization until after August 6, 2001. Thus, the district court attributed to Reese the intended loss of the organization during the time period when he was found to be an active participant, from August 6, 2001, until the scheme ended in November 2001.

This amount included actual losses incurred during this time period in the amount of $67,648, in addition to potential losses in the amount of the face value of the checks seized from the Gordon-Eppard residence. For each defendant, the intended loss was greater than $400,000 but less than $1,000,000, and the sentencing court accordingly enhanced the offense level for each by fourteen pursuant to U.S.S.G. § 2B1.1(b)(H). The sentencing court then granted defendants' requests for a three-level reduction for attempt pursuant to U.S.S.G. § 2X1.1(b)(1), on the basis that considerable steps needed to be performed before the intended losses could have been realized.

Osborne was sentenced to seventy months of imprisonment to be followed by sixty months of supervised release, and was required to pay $157,019 in restitution, jointly and severally with the other defendants. Reese was sentenced to the same length of imprisonment and supervised release as Osborne, and was jointly and severally responsible for paying $67,648 in restitution.[1] Gordon was sentenced to eighty-four months of imprisonment to be followed by sixty months of supervised release, and was jointly and severally responsible for paying $157,019 in restitution with the other defendants. On appeal, each defendant argues that error occurred in calculating the amount of loss.

---

[1] Reese's late entry into the organization accounts for the reduced restitution amount.

## II

At sentencing, the government bears the burden to prove by a preponderance of the evidence that the conduct of others is to be attributed to the sentenced defendant. United States v. Melton, 131 F.3d 1400, 1403 (10th Cir. 1997). Osborne, who acted as a front-runner in the organization, argues that the district court erred in holding him accountable for the intended loss of the entire organization, rather than limiting loss to the amount obtained by the three cashers whom he personally employed. We review the district court's factual findings to determine whether there was clear error, and we review the ultimate determination of relevant conduct de novo. United States v. Tran, 285 F.3d 934, 938 (10th Cir. 2002).

U.S.S.G. § 2B1.1 provides a base offense level of six for crimes involving altered or counterfeit instruments, and includes an enhancement based on the dollar value of loss. When the amount of loss exceeds $400,000, but is less than $1,000,000, the offense level increases by fourteen. § 2B1.1(b)(H). Amount of loss is defined as the greater of "actual loss" or "intended loss," where actual loss includes "the reasonably foreseeable pecuniary harm that resulted from the offense," and intended loss "(I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur." Id. cmt. 2(A)(i), (ii).

U.S.S.G. § 1B1.3 provides that in the case of a jointly undertaken criminal activity, the base offense level shall be determined on the basis of "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." Thus, a defendant will be held accountable for the conduct of others when that conduct is (1) "in furtherance of the jointly undertaken criminal activity," and (2) "reasonably foreseeable in connection with that criminal activity." § 1B1.3, cmt. n.2.

In determining relevant conduct in Osborne's case, the sentencing court held Osborne accountable for the $825,000 of losses intended by the entire organization, rejecting Osborne's argument that the amount of loss should be limited to the $45,325 generated by his individual cell, that is, by the three cashers he personally employed. This decision was based on the finding that the aggregate losses of the entire scheme were foreseeable to Osborne because he knew the other front-runners and the "general outlines and what was done by all the cells." (4 Osborne R. at 37.) The sentencing court concluded that the entire scheme was within the scope of Osborne's agreement because: (a) Osborne knew the other front-runners and agreed to protect the bosses by acting as a buffer between them and the cashers, and (b) because each cell shared a common source of counterfeit checks, common modus operandi, common purpose, and common victims. Thus, Osborne was held accountable for the intended loss of the entire

organization. As this amount exceeds $400,000 but is less then $1,000,000, the district court enhanced the offense level by fourteen points pursuant to U.S.S.G. § 2B1.1(b)(1)(H).

Osborne played a managerial role in the organization by recruiting cashers and admitted in his statement in advance of his guilty plea that he was "working together" with the bosses and other front-runners to "execute[] a scheme to defraud." (1 Osborne Supp. R. at 5); see United States v. Robbins, 197 F.3d 829, 851 (7th Cir. 1999) (concluding that defendant who was a "trusted lieutenant and part of the inner circle of the leaders" was responsible for the full amount of drugs attributable to a conspiracy even though he neither played a leadership role nor personally participated in every drug transaction (quotation omitted)); cf. Melton, 131 F.3d at 1406 (holding that defendant may not be accountable for an act of others where he played a minimal role in the conspiracy and had no direct dealings with the leaders). He agreed to protect the bosses by acting, along with his fellow front-runners, as a buffer between them and the cashers, and understood that each cell would work in an identical manner. See Tran, 285 F.3d at 938–39. Based on this evidence, we hold that the district court's factual conclusion as to the scope of Osborne's agreement is not clearly erroneous and affirm its finding that the intended losses of the entire plan were attributable to Osborne.

## III

Like Osborne, Reese acted as a front-runner, and also assisted in stealing checks from the mail. On appeal, Reese raises three distinct arguments. First, he contends that the sentencing court violated the Ex Post Facto Clause by applying the 2001 version of the Sentencing Guidelines rather than the prior version. Second, he claims that the district court miscalculated the amount of intended losses by basing it on the face value of stolen and counterfeit checks seized from the Gordon-Eppard residence. Third, he maintains that the district court improperly ordered restitution against him in the amount of $67,648.

### A

Reese's Ex Post Facto claim is predicated on the fact that his participation in the scheme ended on August 28, 2001, the date he was arrested with one of his cashers.[2] Based on this fact, he argues the district court violated the Ex Post Facto Clause by utilizing the 2001 version of the Sentencing Guidelines, which did not become effective until November 1, 2001, a point after his offending conduct had allegedly ended. Whether the district court applied the correct version of the Sentencing Guidelines presents a question of law we review de novo, United States v. Easterling, 157 F.3d 1220, 1224 (10th Cir. 1998); however,

---

[2] Because the record does not indicate when Reese was released, we presume that it occurred shortly after his arrest.

- 10 -

we review the district court's underlying factual findings for clear error, United States v. Archuletta, 231 F.3d 682, 684 (10th Cir. 2000).

On the basis of its finding that Reese remained actively involved in the conspiracy after the date of his arrest, until the conspiracy as a whole ended on November 29, 2001, the trial court rejected Reese's claim that his conduct ended before the 2001 amendments came into effect. This finding was based on Eppard's testimony that Reese stole checks for the organization sometime in September 2001, and that these checks were used to create counterfeit checks to be negotiated later. We find no fault in this analysis and conclude that the district court was not clearly erroneous in concluding that Reese's participation in the conspiracy continued past November 1, 2001, the effective date of the 2001 amendments.

**B**

In addition to challenging the application of the 2001 version of the guidelines, Reese argues that the district court erred in utilizing the face value of checks seized from the Gordon-Eppard residence to determine the intended loss of the entire scheme. "Factual findings supporting a district court's calculation of loss . . . are reviewed for clear error." United States v. Knox, 124 F.3d 1360, 1365 (10th Cir. 1997); see also United States v. Peterson, 312 F.3d 1300, 1302 (10th Cir. 2002) (holding that we review factual determinations as to the amount

of loss resulting from illegal activity for clear error).  Reese contends that "[t]he face amount of the checks at the Eppard/Gordon residence has nothing to do with the amount for which said checks would be counterfeited.  In other words, the amount written on a stolen check bore no relation to how much was entered on the check when the counterfeit check was created."  (Reese Appellant's Br. at 14.)

According to the testimony of Postal Inspector Randy Griffin, the checks seized from the Gordon-Eppard residence included stolen checks as well as counterfeit checks.  Although the evidence suggests that not all of these would actually be negotiated, Griffin testified that "any check with an account number on it could have been used and all of the checks that amounted to $708,000 had an account number on them."  (4 Osborne R. at 35–36.)  In concluding that the face value of the seized checks should be used to determine potential loss, the district court stated:

> I am very mindful of the fact that some of those checks, the counterfeited checks and the stolen checks, might not have been what the bosses would have used, but I have heard the testimony of the agent that if it had an account number, it could have been used.  And I'm mindful of the fact that in difficult circumstances such as these, the government does not have to precisely pinpoint the amount of loss.

(4 id. at 39.)  The court also recognized:

> [T]here is no way to know how many times or for what amounts the checks that were discovered during the raid of the Gordon home, how many times they would have been used.  There was testimony that some of these checks were used time and time again.  And I'm

mindful of the fact that under the guidelines I am to use the best method I can, recognizing that sometimes it cannot be perfect.

(3 Reese R. at 8.) To account for its imprecision in estimating potential loss, moreover, the sentencing court granted a three-point reduction for attempt under § 2X1.1, stating: "I found very persuasive the fact that there were some considerable steps left to be performed, and steps that very likely would have resulted in far less loss. For example, . . . they didn't use all of the checks." (4 Osborne R. at 39.)

In calculating the amount of loss for purposes of determining relevant conduct, the district court "need only make a reasonable estimate of loss." U.S.S.G. § 2B1.1, cmt. 2(C); see also United States v. Copus, 110 F.3d 1529, 1535 (10th Cir. 1997) ("A reasonable estimate of loss will suffice."). The Application Note further explains:

> The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference. See 18 U.S.C. § 3742(e) and (f).
>
> The estimate of loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following:
> (i)     The fair market value of the property unlawfully taken or destroyed . . .
> (iv)   More general factors, such as the scope and duration of the offense . . .

U.S.S.G. § 2B1.1, cmt. 2(C). Given Griffin's testimony that any check with an account number could potentially be negotiated, that all of the seized checks from the Gordon-Eppard residence had account numbers on them, and the uncontroverted fact that a single stolen check would be counterfeited multiple times for increased amounts, the district court was not clearly erroneous in using the face value of the seized checks to estimate the intended loss.

**C**

Finally, Reese challenges the restitution order of $67,648, the amount of counterfeit checks cashed during the period Reese was found to be active in the conspiracy, rather than the $28,388 amount that he and Rother, the casher whom he primarily employed, obtained. We review the legality of a restitution order de novo, again reviewing the factual findings underlying the order for clear error and the amount of restitution for abuse of discretion. United States v. Nichols, 169 F.3d 1255, 1278 (10th Cir. 1999).

18 U.S.C. § 3663(a)(1)(A) provides that a court may order restitution by a defendant to any victim of a bank fraud offense. "[T]he losses caused by the entire conspiracy, not just the losses caused by those acts committed by the defendant, can be attributed to the defendant when the district court orders restitution." United States v. Brewer, 983 F.2d 181, 185 (10th Cir. 1993). Even when a defendant is not formally convicted of conspiracy, a district court may

order a restitution amount for the relevant conduct of others that may be attributed to him. United States v. Tucker, 286 F.3d 505, 512 (10th Cir. 2002). Reese does not challenge the district court's conclusion that his relevant conduct includes the actual loss from checks negotiated by the organization while he participated in it (although he does challenge the calculation for potential loss). Therefore, the court did not abuse its discretion in ordering restitution in the amount of $67,648, jointly and severally, based on the reasonably foreseeable actual losses caused by the other members of the conspiracy.

**IV**

Like Reese, Gordon, one of the bosses, challenges the district court's calculation of intended loss based on the face value of stolen and counterfeit checks found in his home. In response, the government maintains that Gordon waived this claim by failing to raise it before the sentencing court. When a defendant fails to raise a factual issue at sentencing, we will "consider the issue waived and will not find plain error." United States v. Overholt, 307 F.3d 1231, 1253 (10th Cir. 2002).

Even were we to conclude that Gordon properly preserved this issue for appeal, our holding above that the district court did not commit clear error in calculating the amount of loss precludes relief for Gordon on this claim.

## V

All sentences are **AFFIRMED**.