F I L E D
**United States Court of Appeals
Tenth Circuit**

**May 30, 2006**

**Elisabeth A. Shumaker
Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

CHRISTOPHER LEE WARD,

      Defendant-Appellant.

No. 04-6066
(W. D. Oklahoma)
(D.Ct. No. 03-CR-92-R)

**ORDER AND JUDGMENT**[*]

Before **O'BRIEN**, **HOLLOWAY**, and **TYMKOVICH**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Christopher Ward appeals from his conviction after a jury trial for attempting to manufacture methamphetamine in violation of 21 U.S.C. §§

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

841(a)(1), 846.  He also challenges his 327 month sentence.  Exercising jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we affirm Ward's conviction but remand to the district court with directions to vacate its restitution order.  Ward's sentence is affirmed in all other respects.

## I.  Background

We provide a brief background of the facts; other relevant facts will be provided as  needed in our discussion of the issues.

Near midnight on January 17, 2003, a camper trailer belonging to the mother of co-defendant Christy Tiger caught fire and burned to the ground.  The trailer was sixteen feet long and approximately eight feet wide and was located on Indian land in Norman, Oklahoma.  At the time of the fire, four people were inside the trailer:  Ward, Tiger, Jennifer Shultz (Ward's girlfriend) and sixteen-year-old Daniel Long.  All four individuals were injured and transported to the hospital; Shultz and Long died.

Investigators discovered a number of items at the scene associated with the manufacture of methamphetamine, including acids/caustic acids, camping fuel, lithium batteries, a two-burner camping stove, a substance believed to be rock salt, a five-gallon propane tank leaking anhydrous ammonia, and a red rubber hose with brass fittings on each end which were blue in color, indicating the presence of anhydrous ammonia.  On May 8, 2003, based on the belief that the fire started as a result a methamphetamine lab, the government indicted Ward and

Tiger with attempting to manufacture methamphetamine resulting in the death of two individuals in violation of 21 U.S.C. §§ 841(a)(1), 846 and penalty provision 21 U.S.C. § 841(b)(1)(C). Tiger was also indicted for opening and maintaining a place for the purpose of manufacturing methamphetamine in violation of 21 U.S.C. § 856(a)(1). Eventually, the government filed a superseding indictment against Ward and a superseding information against Tiger. The superseding indictment charged Ward with the second degree murder of Shultz, an Indian, in violation of 18 U.S.C. §§ 1111(a) and 1152 (Count 1), and the attempted manufacture of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 846 (Count 2). The superseding information charged Tiger with accessory after the fact in violation of 18 U.S.C. § 3.

On August 26, 2003, Tiger pled guilty to the superseding information. She was eventually sentenced to eighteen months imprisonment. Ward proceeded to trial. The jury found him not guilty on Count 1 (second degree murder) but guilty on Count 2 (attempted manufacture of methamphetamine). On February 19, 2004, Ward was sentenced to 327 months imprisonment and ordered to pay restitution in the amount of $11,522.40 to Shultz's parents. This appeal followed.

## II. Discussion

Ward raises a number of issues surrounding his conviction and sentence. Because of the number of issues raised, we divide our discussion--first addressing the issues pertaining to his conviction and then addressing all sentencing issues.

-3-

A. Conviction

 1. Motion to Suppress

After the fire had been extinguished, various law enforcement agencies were called to the scene, including the Absentee Shawnee Tribal Police Department, the City of Norman Police Department, the Cleveland County Sheriff, and the Federal Bureau of Investigation (FBI). The City of Norman Fire Department also assisted in the investigation. After these agencies had visited the scene, a hazardous waste clean-up company under contract with the Drug Enforcement Administration (DEA) disposed of the acids/caustic acids, the propane tank, the two-burner stove, the red hose, the alleged rock salt, the camping fuel containers and the lithium batteries. Before these items were destroyed, they were photographed and documented.

On May 30, 2003, Ward filed a motion to suppress based on the government's destruction of these items. An evidentiary hearing was held on August 27, 2003. After the hearing, the district court denied the motion concluding:

> [T]he evidence does not establish any wrongdoing by the officials who were present at the scene of the fire. The focus of the fire department personnel was not the gathering of evidence to support the commission of a crime; rather, their role was to investigate the origin of the fire. Because they are not law enforcement officers having a duty to obtain criminal evidence, the fact that they did not gather items and have them tested in a laboratory does not reflect bad faith or wrongdoing on their part. The evidence before the court established that the removal and ultimate destruction of items found at the scene was consistent with

> DEA policy; the removal was performed by a company with which the DEA contracted for such purposes. There is no evidence that there was a departure from DEA policy. Even if the evidence could have potentially been useful to [Ward], he must show that the government acted in bad faith in destroying it. The evidence before the court does not support that conclusion.

(R. Doc. 125 at 8-9 (citation omitted).) Based on this ruling, the government was allowed at trial to present evidence of the destroyed items through photographs and the on-scene officers' testimony.

Ward contends the court erred in denying his motion to suppress, arguing that all of the items represented to the jury as being associated with the manufacturing of methamphetamine are common items, which serve legitimate purposes not associated with illegal activity. He claims that had these items been properly tested and/or preserved, he could have easily proved that none of them had been used to manufacture methamphetamine and the fire was merely an accident. Specifically, he states that had the government preserved the red rubber hose, which the government claimed was used to transfer anhydrous ammonia from the propane tank, he could have shown that the hose did not fit the tank. He also argues further testing could have been performed to determine the source of the blue coloring on the hose's brass fittings. As to the acids/caustic acids, propane tank, camping fuel containers, and alleged rock salt, Ward contends testing should have been performed to determine their contents and/or identity. He claims such testing would have shown that none of these items were used in

-5-

the production of methamphetamine. Additionally, Ward argues the battery package should have been tested for fingerprints and had such testing been conducted, it would have revealed Ward's fingerprints were not present. Lastly, Ward asserts that even though one of the fire investigators testified a laboratory could have determined whether the two-burner camping stove was operational and caused the fire, no such testing was performed.

Ward also contests the court's finding that the officers at the scene did not act in bad faith. Specifically, he claims (1) the evidence was destroyed contrary to DEA policy, (2) the fire investigators at the scene were acting as law enforcement personnel and had a duty to collect and preserve evidence, (3) all of the officers at the scene were highly trained in the recognition, preservation and collection of evidence and immediately suspected criminal activity and (4) testing facilities were available to the officers.

When reviewing the denial of a motion to suppress, we accept the district court's factual findings unless clearly erroneous and consider the evidence in the light most favorable to the government. *United States v. Bennett*, 329 F.3d 769, 773 (10th Cir. 2003). We review for clear error the district court's conclusion that the government did not destroy potentially exculpatory evidence. *United States v. Bohl*, 25 F.3d 904, 909 (10th Cir. 1994). "The inquiry into allegations of prosecutorial bad faith presents a mixed question of fact and law in which the quintessential factual question of intent predominates." *Id.* (quotations omitted).

In *California v. Trombetta*, the Supreme Court held that "the Due Process Clause of the Fourteenth Amendment does not require [] law enforcement agencies [to] preserve breath samples in order to introduce the results of breath-analysis tests at trial." 467 U.S. 479, 491 (1984). In doing so, it noted the officers were "acting in good faith and in accord with their normal practice." *Id.* at 488 (quotations omitted). It further concluded that whatever duty the Due Process Clause imposes on the government to preserve evidence, "that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *Id.* Thus, the government violates due process under *Trombetta*, when it destroys evidence that (1) "possess[es] an exculpatory value that was apparent before [it] was destroyed" and (2) is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489; *see also Bohl*, 25 F.3d at 909-10. In *Arizona v. Youngblood*, the Court extended *Trombetta*, holding that where the government fails to preserve "evidentiary material of which no more can be said than it could have been subjected to tests, the results of which might have exonerated the defendant," no due process violation occurs unless the defendant demonstrates the government acted in bad faith. 488 U.S. 51, 57 (1988); *see also Bohl*, 25 F.3d at 910. Therefore, under *Youngblood*, to demonstrate a due process violation based on the government's failure to preserve evidence, the defendant must show (1) the evidence was "potentially useful" and (2) the government acted in bad faith.

*Youngblood*, 488 U.S. at 58.

We start with *Trombetta*. In this case, the items destroyed had no "apparent" exculpatory value at the time they were destroyed. Indeed, they all appeared to be associated with the manufacture of methamphetamine. Thus, the most Ward has shown is that if the items were available, further testing may have produced exculpatory evidence. This is insufficient to warrant application of *Trombetta*. *See United States v. Parker*, 72 F.3d 1444, 1451 (10th Cir. 1995) ("The mere possibility that lost or destroyed evidence could have exculpated a defendant is not sufficient to satisfy *Trombetta*'s requirement that the exculpatory value be apparent to the police before destruction.") (quotations omitted). Turning to *Youngblood*, we conclude Ward has demonstrated that the destroyed evidence was "potentially useful." However, as the district court concluded, he has failed to demonstrate bad faith by the officers at the scene.

"Our inquiry into bad faith must necessarily turn on the [police officer's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Bohl*, 25 F.3d at 911. We may consider whether: (1) the government was on notice that the defendant believed the evidence to be potentially exculpatory; (2) the defendant's assertion to the government that the evidence possesses potential exculpatory value was merely conclusory or supported by objective, independent evidence, (3) the government still had possession of or the ability to control the disposition of the evidence at the time it received notice

-8-

from the defendant of the evidence's potential exculpatory value, (4) the destroyed evidence was central to the government's case, (5) the government offers an innocent explanation for its failure to preserve the evidence, and (6) the destruction of the evidence was in accordance with standard procedure and the evidence was adequately documented prior to its destruction. *Id.* at 911-13.

In this case, the items were destroyed immediately after the fire, before the government was aware that Ward believed they were potentially exculpatory. When it received notice, it no longer possessed the items. Thus, the first, second and third factors weigh against a finding of bad faith, as the government did not destroy the items knowing Ward believed them to be potentially exculpatory. As to the fourth factor, the destroyed evidence was a crucial part of the government's case against Ward. However, it was not the only evidence of his guilt. The government also presented the testimony of Tiger and Michael Baird, who was in prison with Ward. Both testified Ward admitted he was making methamphetamine in the trailer. Therefore, the fourth factor is neutral.

Turning to the fifth and sixth factors, the testimony at the evidentiary hearing revealed that all of the officers at the scene were trained in recognizing, collecting and preserving evidence. They suspected a methamphetamine lab. Nevertheless, according to the testimony, the officers acted properly under the circumstances and/or in accordance with their respective agencies' policies.

The fire department's arson investigators, Kevin Leach and Fire Marshal

Bobby Sirples, observed several items associated with the production of methamphetamine. They did not seize these items or perform any tests.[1] Their role was to determine the cause of the fire, but when a methamphetamine lab is suspected, the fire department defers to the police department for processing of the scene. The tribal police department was initially in charge of the investigation. It eventually turned the investigation over to the FBI and Norman Police Department. The tribal police officers did not seize any evidence, with the exception of a pair of coveralls which were located near Ward's and Tiger's vehicles. FBI Agent Mark Maag did not observe or collect any of the destroyed evidence because he arrived at the scene after the DEA's clean-up company had already performed its duties.

Lastly, DEA Agent Robert Ryan testified about the DEA's policy concerning the handling of evidence at a suspected methamphetamine lab. A company authorized to dispose of hazardous waste removes and destroys any evidence deemed hazardous, toxic or dangerous; any non-hazardous items are retained as non-drug evidence. Significantly, Agent Ryan testified that in situations involving methamphetamine labs, especially where a fire has occurred, almost all items associated with the lab are destroyed because they are considered hazardous and contaminated.

---

[1] The fire investigators did seize a catalytic heater because Tiger had told a fireman that the fire started when she lit the heater.

Based on this testimony, the fifth and sixth factors are equivocal. The agencies involved deferred to the DEA because a methamphetamine lab was suspected. The items destroyed were associated with that lab. Pursuant to DEA policy, they were deemed contaminated/hazardous and destroyed. Prior to their destruction, the items were photographed and documented. In spite of the destruction policy (and the deference of other investigatory agencies), bad faith might be inferred. But that was not the finding of the district court, which is in the best position to assess the evidence.

The district court's finding that the government did not act in bad faith is not clearly erroneous and the denial of the motion to suppress was proper.

2. Vindictive Prosecution

Depending on whether the defendant has a prior felony drug conviction, 21 U.S.C. § 841(b)(1)(C) provides for a term of imprisonment of either twenty or thirty years for the manufacturing of any amount of methamphetamine. An enhanced penalty also applies "if death or serious bodily injury results from the use of such substance." 21 U.S.C. § 841(b)(1)(C). The initial indictment alleged Ward "knowingly and intentionally attempted to manufacture methamphetamine . . . and such attempt resulted in the death of two individuals, in that, [Ward] attempted to manufacture methamphetamine in a trailer . . . resulting in an explosion and fire that caused the death of a 16-year-old male [Long] and a 20-year-old woman [Shultz]" in violation of 21 U.S.C. §§ 841(a)(1), 846 and penalty

-11-

provision 21 U.S.C. § 841(b)(1)(C).

On June 5, 2003, Ward filed a motion to strike the language from the indictment concerning the deaths of Shultz and Long. Because those deaths did not result from the "use of" methamphetamine, Ward claimed the enhanced penalty for death did not apply. The government objected. At a hearing on August 27, 2003, the motion to strike was discussed. Prior to that discussion and any ruling by the court, the government announced its intention to seek a superseding indictment against Ward on September 2, 2003. Having found no controlling authority concerning the meaning of "use of" for purposes of 21 U.S.C. § 841(b)(1)(C), the government decided to file a superseding indictment against Ward for the murder of Shultz who, it had discovered the day before, was an enrolled member of an Indian tribe, thereby establishing federal jurisdiction over her death. On August 29, 2003, the court issued an order granting Ward's motion to strike. It concluded the enhanced penalty for death applies only when the death results from the victim's ingestion of a controlled substance which had been distributed or manufactured by the defendant. Consequently, it determined the enhanced penalty was not intended to apply where death results from the defendant's attempted manufacture of a controlled substance.

Consistent with its announced intent, on September 2, 2003, the government filed a superseding indictment against Ward, charging him with second degree murder and attempting to manufacture methamphetamine. Two

-12-

days later, Ward filed a Motion for Bill of Particulars, requesting the government to substantiate the murder charge. The motion was denied.

On appeal, Ward contends the government, without presenting any new evidence to the grand jury, indicted him for the murder of Shultz to "punish" him for successfully challenging the indictment and to incite the jury.[2] (Appellant's Opening Br. at 26.) He claims the filing of the superseding indictment constituted prosecutorial vindictiveness and such vindictiveness is evident by the timing of the indictment and the lack of new evidence supporting the murder charge.

Normally, we review a district court's factual findings on prosecutorial vindictiveness for clear error and its legal conclusions *de novo*. *United States v. Sarracino*, 340 F.3d 1148, 1177 (10th Cir. 2003). However, because Ward did not raise this issue in the district court, our review is for plain error. *United States v. Buonocore*, 416 F.3d 1124, 1128-29 (10th Cir. 2005). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir.) (en banc) (quotations omitted), *cert. denied*, 126 S.Ct. 495 (2005). We

_____

[2] Ward also asserts the government indicted him for Shultz's murder to allow it to present evidence of his prior convictions, which he claims would not have been admissible absent the murder charge. Not exactly. As we explain below, Ward's prior convictions were relevant to the attempted manufacture of methamphetamine charge and would have been admissible in the absence of the murder charge.

need not go beyond the first step because no error is evident.

> To prove prosecutorial vindictiveness, the defendant must prove either (1) actual vindictiveness, or (2) a realistic likelihood of vindictiveness which will give rise to a presumption of vindictiveness. If the defendant proves either element, the burden shifts to the government to justify its prosecutorial decision based on legitimate, articulable, objective reasons. If the defendant fails to prove either element, the trial court need not address the government's justification for its prosecutorial decision. Merely by the appearance of vindictive motives, vindictiveness may not be presumed. In determining whether the government has engaged in prosecutorial vindictiveness, this court must determine whether the prosecution engaged in conduct that would not have occurred but for the prosecution's desire to punish the defendant for exercising a specific legal right.

*Sarracino*, 340 F.3d at 1177-78 (quotations and citations omitted).

Ward's vindictive prosecution claim fails. Although the government may not punish a defendant for exercising constitutional or statutory rights in the course of criminal proceedings, *United States v. Raymer*, 941 F.2d 1031, 1040 (10th Cir. 1991), it may punish him for violating the law. *United States v. Carter*, 130 F.3d 1432, 1443 (10th Cir. 1997). The government had probable cause to believe Ward was responsible for Shultz's death. Absent evidence of vindictive motive, it was within its discretion to decide whether or not to prosecute Ward for Shultz's death and what charge to bring against him. *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). In this case, there is no indication the filing of the superseding indictment was motivated by vindictiveness, *i.e.*, to punish Ward for successfully challenging the initial indictment. Rather, the record demonstrates it was the result of the government learning it had jurisdiction over Shultz's death

-14-

due to her Indian heritage. Although it was filed immediately after the district court's ruling on the motion to strike, the government had previously announced its intention to seek a superseding indictment to address Shultz's death. Moreover, the government had to await the district court's ruling on Ward's motion to strike before filing the superseding indictment because the ruling would impact the attempted manufacture of methamphetamine charge, in particular, whether the enhanced penalty applied.[3]

### 3. Evidentiary Errors

Ward alleges the district court erred in allowing the government to introduce evidence of his prior convictions, in allowing the jury to hear evidence of Daniel Long's death and in admitting hearsay testimony concerning the items found at the scene. We review evidentiary rulings for an abuse of discretion. *United States v. Rosario Fuentez*, 231 F.3d 700, 708 (10th Cir. 2000). Given their fact specific nature, we accord even greater deference to a district court's hearsay rulings. *Id.*

#### a. Prior Convictions

Prior to trial, the government filed a notice of intent to use evidence of

---

[3] Ward was acquitted of the murder charge. Even assuming *arguendo* that Ward had demonstrated prosecutorial vindictiveness, the probable remedy, dismissing the murder charge or the superseding indictment, would have been for naught as the original indictment charged him with attempting to manufacture methamphetamine, the charge for which he was convicted.

other crimes, wrongs or acts, to wit: Ward's two 1996 convictions for manufacturing and/or attempting to manufacture methamphetamine, as proof of motive, intent, plan and knowledge. Ward objected and filed a motion in limine to exclude the evidence. Finding the prior convictions probative of Ward's knowledge and intent under Rule 404(b) of the Federal Rules of Evidence and that their probative value outweighed their unfairly prejudicial effect, the district court overruled Ward's objection and denied his motion in limine. At trial, prior to testimony concerning Ward's prior convictions, Ward renewed his objection. In response, the government argued Ward's prior convictions passed muster under Rule 404(b) because they were probative of Ward's knowledge of the manufacturing process. Aside from Rule 404(b), the government argued they were admissible for purposes of the murder charge as direct evidence of his knowledge of the danger inherent in manufacturing methamphetamine. The district court overruled Ward's objection, concluding evidence of his prior convictions was relevant concerning his knowledge of the dangerousness of manufacturing methamphetamine. Consistent with this ruling, it gave the following oral limiting instruction to the jury when the evidence was admitted:

> Ladies and gentlemen, I have allowed this . . . evidence about prior criminal involvement, and I think there will also be evidence of prior convictions of this defendant in regard to both the manufacture of methamphetamine and the attempted manufacture of methamphetamine. Ordinarily, prior convictions are not admissible against a defendant because we don't want a jury to [t]hink, "Well, just because they have committed a crime in the past, they must have

committed this crime." That's just not an appropriate thought process for a jury to go through.

However, I have allowed this testimony in as it might be relevant to you on the question of his knowledge of the process by which methamphetamines are manufactured, and also on the issue of their dangerousness.

(R. Vol. II at 298.) It followed up with a similar written and oral instruction in its final charge to the jury.

On appeal, Ward continues to argue error in admitting evidence of his prior convictions. First, he claims the government used the convictions to convince the jury that he committed the instant offense, a purpose which is forbidden by Rule 404(b). Second, he states the evidence was not relevant and unfairly prejudicial because the prior convictions were not temporally related to this case and involved a different method of manufacturing methamphetamine. Next, although he concedes his prior convictions were arguably relevant to show his knowledge of the danger involved, Ward maintains it was not necessary for the government to use them to prove knowledge. That is because two seasoned fire investigators who testified at trial could have rendered their opinion concerning the dangerousness of cooking chemicals in a confined area. We begin our discussion with the last argument.

Second degree murder requires malice aforethought. 18 U.S.C. § 1111(a). Ward's knowledge of the inherent danger of methamphetamine production is no small part of that burden. Proof that Ward had first-hand experience with the manufacturing process permits a jury to infer such knowledge. Expert opinion, while

-17-

useful, cannot provide an equally probative substitute for that direct evidence. Admission of Ward's prior convictions involving methamphetamine production was proper and not dependent on Rule 404(b), but they would also be admissible under that rule.

> Rule 404(b) states:
>
> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

"The list of proper purposes is illustrative, not exhaustive, and Rule 404(b) is considered to be an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition." *United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001) (quotations omitted). "To determine if the admission of Rule 404(b) evidence was proper, we apply a four-part test which requires that: (1) the evidence was offered for a proper purpose under Fed. R. Evid. 404(b); (2) the evidence was relevant under Fed. R. Evid. 401; (3) the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice under Fed. R. Evid. 403; and (4) the district court, upon request, instructed the jury to consider the evidence only for the purpose for which it was admitted." *United States v. Wilson*, 107 F.3d 774, 782 (10th Cir. 1997). Evidence is relevant under Rule 401 if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it

-18-

would be without the evidence."

The four requirements for admissibility of Rule 404(b) evidence are met in this case. First, Ward's prior convictions were not admitted to prove Ward's criminal disposition. Rather, they were offered to show Ward's knowledge of the manufacturing process and its dangerousness, both proper purposes under Rule 404(b). Second, the evidence was relevant under Rule 401. "[P]rior narcotics involvement is relevant when [it] is close in time, highly probative, and similar to the activity with which the defendant is charged." *United States v. Becker*, 230 F.3d 1224, 1232 (10th Cir. 2000) (quotations omitted). Ward's prior convictions involved the manufacturing or attempted manufacturing of methamphetamine, one of the charges for which he was tried. Although his prior convictions involved a different manufacturing process, because they involved the same conduct (manufacturing as opposed to possession or distribution) and the same drug, they were sufficiently similar to the current offense.

Ward's prior convictions occurred approximately seven years earlier. Remoteness may erode the probative value of extrinsic evidence. *United States v. Olivo*, 69 F.3d 1057, 1064 (10th Cir. 1995), *supp. on reh'g by* 80 F.3d 1466 (10th Cir. 1996); *see also Becker*, 230 F.3d at 1232. But not necessarily; "[t]here is no absolute rule regarding the number of years that can separate offenses. Rather, the court applies a reasonableness standard and examines the facts and circumstances of each case." *United States v. Cuch*, 842 F.2d 1173, 1178 (10th Cir. 1988). In *Cuch*,

we affirmed the admission of evidence concerning an offense occurring over seven years before the charged offense and recognized that other courts have allowed gaps of five to thirteen years. *Id.* We also noted the seven year gap was somewhat misleading because during part of the time period, the defendant had been serving a thirty month sentence on the prior offense. *Id.* The same is true here. Ward was in prison on his 1996 convictions until November 27, 2001, and in fact, was on parole from those convictions at the time he committed the instant offense. Only a year passed between his release from prison and the commission of this offense. In any event, the passage of time would not diminish his knowledge of the dangerousness of manufacturing methamphetamine.

As to the third admissibility requirement, the district court expressly weighed the probative value of Ward's prior convictions against the potential for unfair prejudice under Rule 403 and concluded the former outweighed the latter.[4] The disparity must be substantial and district courts are afforded broad discretion in Rule 403 balancing decisions. *United States v. Cherry*, 433 F.3d 698, 702 (10th Cir. 2005), *cert. denied*, 126 S.Ct. 1930 (2006). We see no reason to disturb the district

---

[4] Rule 403 states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

court's Rule 403 decision.

Lastly, the district court twice gave a proper limiting instruction. There was no error in admitting Ward's prior convictions.

### b. Daniel Long's Death

On the day of trial, the government informed the court it wished to mention in its opening statement that Daniel Long was the fourth person at the scene and that he had died as a result of the fire. It wished to explain to the jury why it was prosecuting Shultz's death, but not Long's, *i.e.*, because federal jurisdiction only extended to Shultz's death. Ward objected based on the fact he was not charged with Long's death. The district court overruled the objection, stating a brief explanation of Long's death was appropriate for clarification purposes. It also stated the government would be allowed to explain to the jury why it would be hearing more about Shultz than Long.

Based on the court's ruling, in its opening statement, the government stated two people died as a result of the fire, Shultz and Long. It also explained it only had jurisdiction over Shultz's death due to her being an enrolled member of an Indian tribe. Later, during the testimony of Dr. Phillip Andre Floyd, Shultz's treating physician, the government asked him if he was familiar with Long's case. Defense counsel objected. Outside of the hearing of the jury, the government informed the court it only intended to ask Dr. Floyd whether Long had died and its purpose in doing so was to tie up what happened to the fourth person on the scene. The court

overruled the objection and Dr. Floyd said Long had died.  In its closing rebuttal argument, the government again mentioned Long's death, stating

> Christopher Ward was making methamphetamine.  [He] knew the dangers created by using that method in that trailer. . . .  He brought a substance like this that said it was flammable, and he put it in that trailer.  It was reckless, it was call[o]us, it was wanton.  A 16-year-old boy and a 20-year-old girl died.

(Vol. IV at 616.)

Ward argues the district court abused its discretion in allowing the government to refer to and introduce evidence of Long's death because he was not charged with his death and it was not relevant to the charges against him.  He suggests the government's actual purpose in referring to Long's death was to inflame the passion of the jury by attributing two deaths to him.  Ward also contends that by questioning Dr. Floyd concerning Long's fate and making statements in closing argument to the effect that Ward killed Long, the government abused the court's ruling allowing it to refer to Long's death in its opening statement.

We are comfortable with the trial court's decision to permit the government to mention two deaths and explain why only one was charged.  We are less comfortable with the government's conduct.  On a cold record, it seems it made more of Long's death than necessary for its announced purpose of placing events in context for the jury.  But a trial judge is in a much better position to determine if the government exploited a legitimate purpose with ulterior motive and to assess the impact on the jury.  The judge also instructed the jury that argument of counsel is not evidence.

-22-

Apparently, the jury was not inflamed—it acquitted on the murder charge. There was no abuse of discretion. In addition, the substantial evidence supporting Ward's conviction for attempting to manufacture methamphetamine renders harmless any possible overreaching as it may relate to that charge. *See supra,* Section A(5).

### c. Hearsay

At trial, the government offered the testimony of Agent Robert Ryan of the Drug Enforcement Agency (DEA). Agent Ryan has been involved in the investigation or analysis of approximately 1,000 methamphetamine labs during his law enforcement career. He described the "Nazi method" of methamphetamine production, which was the alleged process involved in this case.[5] Upon his review of the records in this case, Agent Ryan opined that a methamphetamine lab was present in the trailer and it was the source of the fire. In making this determination, Agent Ryan found relevant the presence of the propane tank containing anhydrous ammonia, the red hose with blue coloring on both ends, the Coleman camping fuel,

---

[5] The "Nazi method" of manufacturing methamphetamine obtained its name because the process originated in Germany and was utilized in World War II by their troops. It involves four steps. The first step is the extraction of pseudoephedrine from its pill form to a liquid using an organic solvent such as alcohol, methanol or camping fuel. The second step involves adding lithium or sodium metal and anhydrous ammonia to the liquid pseudoephedrine, thereby creating liquid methamphetamine. The next step is to clean the methamphetamine with a strong base such as lye and an organic solvent such as toluene, paint thinner, or camping fuel. The last step is called the gassing phase, whereby rock salt is mixed with a strong acid such as sulphuric, hydriodic or muriatic acid, creating hydrochloride gas. The gas is then mixed with the liquid methamphetamine, transforming it into a powder, which is again cleaned with an organic solvent.

the two-burner stove, the acids/caustic acids removed by the DEA's hazardous waste company, the lithium batteries and the rock salt. When he mentioned the acids/caustic acids, defense counsel objected, arguing there had been no testimony concerning the presence of acids. The government alleged Agent Ryan was merely referring to the records he reviewed to form his opinion. The district court directed the government to lay a better foundation. The government then asked Agent Ryan to describe the clean-up process. Agent Ryan explained that the DEA is required to utilize a licensed hazardous waste disposal company to clean up methamphetamine lab sites. As part of the clean-up process, the disposal company is required by federal regulation to prepare a document indicating the items taken from the scene; one of the items listed on that document in this case was acids/caustic acids. According to Agent Ryan, one of the fire investigators at the scene informed him that he saw an acid-type bottle containing a yellow liquid. Agent Ryan testified this liquid was most likely a sulphuric or muriatic acid which is typically found at methamphetamine lab sites.

On appeal, Ward argues the district court erred in allowing Agent Ryan to testify concerning the clean-up company's removal of acids/caustic acids from the scene and the information he gleaned from the on-scene fire investigator because it was hearsay. He also claims the error was not harmless as it was a critical piece of the government's case. Specifically, he states the acids/caustic acids and the bottle containing the yellow liquid were two of the seven factors considered by Agent Ryan

to form his opinion that methamphetamine was being manufactured in the trailer.

Because Ward did not raise a hearsay objection during Agent Ryan's testimony, we review for plain error, which, as we have previously explained, occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Gonzalez-Huerta*, 403 F.3d at 732; *United States v. Martinez*, 76 F.3d 1145, 1150 (10th Cir. 1996).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). It is generally not admissible. FED. R. EVID. 802. But Rule 703 of the Federal Rules of Evidence states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Despite Ward's contention to the contrary, Agent Ryan was testifying as an expert on methamphetamine labs and the production of methamphetamine. The clean-up company's report he relied upon in rendering his opinion that methamphetamine was being manufactured in the trailer was admissible evidence

under the business records exception to the hearsay rule. *See* FED. R. EVID. 803(6). Therefore, under Rule 703, Agent Ryan could disclose it to the jury.

Of a different ilk is Agent Ryan's testimony concerning his conversation with the on-scene fire investigator. It constituted hearsay to which no exception applied. Therefore, it was inadmissible under Rule 703 unless the court concluded its probative value substantially outweighed its prejudicial effect. No such determination was made in this case, probably because Ward did not make a hearsay objection. The trial court was therefore deprived of an opportunity to evaluate the issue and, if necessary, take corrective action.

Nevertheless, assuming Agent Ryan's testimony concerning the acid-type bottle of yellow liquid was erroneously admitted, Ward has not shown that the error affected his substantial rights, the third prong of the plain error standard. "Satisfying the third prong . . . usually means that the error must have affected the outcome of the district court proceedings." *Gonzalez-Huerta*, 403 F.3d at 732. Here, there was other physical evidence at the scene associated with the manufacturing of methamphetamine. Additionally, both Tiger and Baird testified Ward had admitted to making methamphetamine in the trailer. Agent Ryan testified the burn pattern of the fire was "very consistent" with methamphetamine lab fires he had investigated in the past. (R. Vol. III at 388.) Based on this other evidence, we conclude Ward cannot demonstrate the outcome of the trial was affected by Agent Ryan's testimony concerning the presence of the acid-type bottle of yellow liquid at the scene.

4. Prosecutorial Misconduct - Evidence of Other Crimes

During re-direct examination, Tiger admitted methamphetamine was found in her purse at the scene of the fire. When the government asked her where she got the methamphetamine, she replied "Christopher Ward." (R. Vol. III at 455.) Testifying on behalf of the government, Baird stated that while he was visiting Ward in the hospital after the fire, Ward told him "it wasn't worth it." (*Id.* at 468.) Baird understood Ward to be talking about "cooking dope." (*Id.* at 469.) Baird also stated that after Ward was released from the hospital, Ward told Baird that he had been making dope the night before and the night of the fire. During cross-examination, in an attempt to establish that Baird had a motive to lie, defense counsel elicited that Baird believed Ward had started Baird's pickup truck on fire. On re-direct, the government asked Baird whether Ward had been charged with arson pertaining to the burning of Baird's pickup truck. Baird responded affirmatively. At the time of trial, Ward had been charged with starting Baird's truck on fire. By the time of sentencing, however, the charge had been dismissed because another individual had confessed to the crime.

On appeal, Ward contends the government committed prosecutorial misconduct in questioning Tiger and Baird. He argues the government's questions constituted evidence of other crimes committed by Ward in violation of Rule 404(b) of the Federal Rules of Evidence. Although conceding no objection was made to these questions, Ward argues such an objection would have been futile and in any

event, the government's violation constituted plain error.

Normally, "[a]llegations of prosecutorial misconduct are a mixed question of law and fact, which we review de novo." *United States v. Pulido-Jacobo*, 377 F.3d 1124, 1134 (10th Cir.) (quotations omitted), *cert. denied*, 543 U.S. 1030 (2004). However, where, as here, no objection is made at trial, our review is for plain error. *United States v. Magallanez*, 408 F.3d 672, 679-80 (10th Cir.), *cert. denied*, 126 S.Ct. 468 (2005). Determining whether the government's actions constituted prosecutorial misconduct involves a two step process. First, we examine whether the prosecutor's conduct was in fact improper. *Pudillo-Jacobo*, 377 F.3d at 1134. If so, then we determine whether the error was harmless beyond a reasonable doubt. *Id.* "To determine whether prosecutorial misconduct is harmless, we must look to the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case as a whole." *Id.* (quotations omitted).

The challenged questioning of Tiger was proper. Prior to Tiger's testimony, there had been testimony that the only methamphetamine found at the scene of the fire was in Tiger's purse. By questioning Tiger on re-direct about the source of the methamphetamine found in her purse, the government was merely attempting to show that Ward was the source of the methamphetamine found at the scene, thereby implying he was the methamphetamine cook. As to the government's questioning of Baird concerning whether Ward had been charged with the burning of Baird's pickup truck, it was proper rebuttal to the defense's suggestion that Baird had a motive to lie

because he believed Ward started his truck on fire. At the time of trial, Ward had been charged with arson of Baird's truck. Therefore, no plain error occurred. Assuming error, it was harmless based on the other evidence presented supporting the jury's verdict, which we discuss next.

     5. <u>Sufficiency of the Evidence</u>

Ward contends the government presented insufficient evidence at trial to support his conviction. He claims the government at most showed that he had pled guilty to manufacturing methamphetamine in the past, not that he attempted to manufacture methamphetamine on the date charged. He also argues the evidence showed that if anyone was manufacturing methamphetamine, it was Tiger. He states both the trailer and the land upon which it was emplaced belonged to Tiger's mother, who left it in Tiger's care while she was away. Additionally, Ward asserts neither ephedrine or pseudoephedrine, critical ingredients in the manufacturing of methamphetamine, were found at the scene. Nor was there any evidence that he purchased these substances. Indeed, he states the only methamphetamine found at the scene was in Tiger's purse. Lastly, Ward maintains there was no evidence that binders, lye, Drain-o, sulfuric acid, muriatic acid, beakers, vials, glassware, or pump spray were found at the scene, although all are necessary in the manufacturing process.

"We review de novo whether the prosecution presented sufficient evidence to support a conviction." *United States v. Avery*, 295 F.3d 1158, 1177 (10th Cir. 2002).

"In conducting this review . . . we ask whether, taking the evidence--both direct and circumstantial, together with the reasonable inferences to be drawn therefrom--in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.* (quotations omitted). We will not evaluate witness credibility or re-weigh the evidence. *Id.* We will only reverse a conviction if no rational trier of fact could have reached the disputed verdict. *United States v. Wilson*, 182 F.3d 737, 742 (10th Cir. 1999). "The evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt. Instead, the evidence only has to reasonably support the jury's finding of guilt beyond a reasonable doubt." *Id.* (citation and quotations omitted). The jury has the "discretion to resolve all conflicting testimony, weigh the evidence, and draw inferences from the basic facts to the ultimate facts." *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998). "However, we may not uphold a conviction obtained by piling inference upon inference." *Id.* "An inference is reasonable only if the conclusion flows from logical and probabilistic reasoning." *Id.* "The evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt." *Id.*

To prove a defendant attempted to manufacture methamphetamine, the government must show:

> (1) intent to manufacture methamphetamine, and (2) commission of an act which constitutes a substantial step towards commission of the substantive offense." Intent to manufacture methamphetamine may be

inferred from the surrounding circumstances. A substantial step is an act that is strongly corroborative of the firmness of the defendant's criminal intent.

*United States v. Haynes*, 372 F.3d 1164, 1167-68 (10th Cir.) (citations and quotations omitted), *cert. denied*, 543 U.S. 974 (2004). The jury was so instructed.

The evidence, considered as a whole and in the light most favorable to the government, was sufficient to convict Ward of attempting to manufacture methamphetamine. Tiger testified as follows:

Ward contacted her the day before the fire and asked her if he and his girlfriend (Shultz) could use the trailer that weekend. Tiger agreed. She and Ward purchased camping fuel in the very early morning hours of January 17, 2003. The next day, when Tiger let Ward and Shultz into the trailer, Ward told her "if everything goes okay, you know, I'll give you a thousand dollars tomorrow." (R. Vol. III at 412-13.) Later, Ward called her, asking her to bring him some salt. Tiger agreed and proceeded to the trailer accompanied by Long. While she was talking with Ward in the trailer, she noticed a curtain was on fire. Attempting to put out the fire, Tiger grabbed a coffeepot and threw its contents at the fire. Rather than dousing the fire, however, an explosion occurred and the whole trailer was immediately engulfed in flames. Once everyone was out of the trailer, they walked to the neighbors to get help. While walking, Tiger asked Ward what was in the coffeepot which would cause such an explosion. Ward told her he was cooking methamphetamine but to tell the police that the fire started when she attempted to light a heater inside the trailer. He threatened to kill her if she said otherwise.

Baird testified: (1) while visiting Ward in the hospital, Ward told him "it wasn't worth it, that what had happened to [Shultz.]" (*id.* at 468); (2) Baird understood Ward to be talking about "cooking dope;" (*id.* at 469) and (3) after Ward's release from the hospital, he told Baird he had been making dope the night

-31-

before and the night of the fire.

In addition to Tiger's and Baird's testimony, the government demonstrated that several items associated with the manufacturing of methamphetamine were found at the scene of the fire. These items included a propane tank containing anhydrous ammonia, an essential chemical in the "Nazi method" of manufacturing methamphetamine. Even Ward's own expert testified there would be no reason to put anhydrous ammonia in a propane tank other than to make methamphetamine. There was also a red hose with blue-colored fittings on each end. DEA Agent Robert Ryan testified the blue coloring indicated that anhydrous ammonia had been passed through it and Ward's expert agreed. Agent Ryan also stated the fitting at one end of the hose appeared to be consistent with that which would normally attach to a propane tank. On the other end of the tank was a wand-type fitting which many methamphetamine cooks use to stir the methamphetamine as they pass the ammonia gas through the mixture. Patricia Anne Bayless Willis, Tiger's mother and the owner of the trailer, testified the propane tank and hose did not belong to her. Additionally, lithium batteries, camping fuel, rock salt and acids/caustic acids were removed from the scene. Agent Ryan testified these items were also associated with the "Nazi method." Given the presence of these items, Ward's attempt to focus on items not found at the scene is unavailing, especially given the fact that some of the items could have been consumed in the fire.

To the extent Ward argues the evidence showed that Tiger was the one

manufacturing methamphetamine, this is contrary to her testimony and the other evidence presented at trial. Additionally, the issue need not be so narrowly tailored. Tiger's discounting her involvement does not exculpate Ward. Based on the evidence at trial, a jury could have concluded that *both* Tiger and Ward were attempting to manufacture methamphetamine in the trailer.

Ward's insufficiency of the evidence argument fails.

### 6. Cumulative Error

Ward argues that to the extent we find harmless errors, the cumulative effect of those errors rendered his trial fundamentally unfair. The cumulative error analysis' purpose is to address the possibility that "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *Rosario Fuentez*, 231 F.3d at 709.

> A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless. Unless an aggregate harmlessness determination can be made, collective error will mandate reversal, just as surely as will individual error that cannot be considered harmless. The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error--courts look to see whether the defendant's substantial rights were affected.

*Rivera*, 900 F.2d at 1470. However, "[c]umulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors." *Id.* at 1471.

-33-

The only harmless error pertained to Agent Ryan's hearsay testimony concerning the acid-type bottle containing yellow liquid found at the scene. There is no cumulate effect.

B.     Sentencing

In Ward's presentence report (PSR), the probation officer decided the applicable guideline for the offense of conviction was USSG §2D1.1, which sets a base offense level determined by the quantity of drugs involved.[6] However, because the drugs involved in this case were consumed in the fire, no quantity was available. Consequently, the probation officer assigned Ward a base offense level of zero. She then increased the base offense level to 30 pursuant to USSG §2D1.1(b)(5)(C), which calls for a six level enhancement or a minimum offense level of 30 if the offense involved the manufacturing of methamphetamine and created a substantial risk of harm to the life of a minor. She treated Ward as a career offender under USSG §4B1.1 and therefore assigned him an offense level of 34. *See* USSG §4B1.1(b) (assigning an offense level of 34 if the offense of conviction's statutory maximum is twenty-five years or more). With a total offense level of 34 and a criminal history category of VI,[7] the officer determined the applicable guideline range was 262 to 327

_____

[6] Ward was sentenced pursuant to the 2003 edition of the United States Sentencing Guidelines Manual. All citations to the guidelines in this opinion refer to the 2003 guidelines unless otherwise indicated.

[7] Although Ward's criminal history points established a criminal history category of V, the career offender guideline required a criminal history category of VI. *See* USSG §4B1.1(b).

months imprisonment.  She also recommended Ward be directed to pay restitution in the amount of $22,522.40 to Shultz's parents based on their lost wages ($2,122.40) and the payments they made for Shultz's vehicle ($11,000) and funeral expenses ($9,400).

Ward filed numerous objections to the presentence report.  In particular, he claimed restitution to Shultz's parents was improper because he did not cause the fire or Shultz's death and restitution for her vehicle and lost wages was inappropriate.[8] Ward also argued the enhancement under USSG §2D1.1(b)(5)(C) did not apply because he did not cause the fire or Long's death.

The government filed a motion for upward departure arguing Ward caused the death of two people, which it claimed was an aggravated circumstance not adequately taken into consideration by the Sentencing Commission.  It proposed an upward departure to offense level 37, which is the offense level that would have applied under the career offender guideline had Ward been convicted of murder.

At sentencing, the district court concluded restitution was appropriate to Shultz's parents.  It concluded there was no doubt Ward "was manufacturing methamphetamine, and as a result of that manufacture, two people were killed, and I

_____

[8] The PSR was ambiguous as to whose lost wages Shultz's parents were seeking--theirs or their daughter's.  At sentencing, Shultz's mother clarified that the lost wages were for the wages she and her husband lost due to their being off work to be at the hospital with their daughter and to attend Ward's trial.  Because they were filed prior to sentencing, Ward's objections to the PSR concerning its restitution recommendation were based on his belief that Shultz's parents were seeking their daughter's lost wages.

think certainly Mr. and Mrs. Shultz are appropriate persons to be compensated as victims under the statute." (R., Sentencing Tr. at 6.) However, it determined restitution was only appropriate for their lost wages and Shultz's funeral expenses, not her vehicle. Therefore, the court ordered restitution to be made to Shultz's parents in the sum of $11,522.40. The court also overruled Ward's objection to the USSG §2D1.1(b)(5) enhancement.[9] It stated it was satisfied that Ward was manufacturing methamphetamine in the trailer, the methamphetamine lab exploded causing the deaths of Shultz and Long and Ward knew of the danger of manufacturing methamphetamine. Lastly, the district court denied the government's motion for upward departure, concluding the maximum sentence under the guideline range satisfactorily served the purposes of punishment in the case. The court sentenced Ward to 327 months imprisonment.

Ward argues the district court erred in applying the USSG §2D1.1(b)(5) enhancement and sentencing him as a career offender under USSG §4B1.1. He also asserts the court erred in assessing restitution.

1. Career Offender

Section 4B1.1(a) of the sentencing guidelines provides:

A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony

_____

[9] This enhancement did not affect Ward's sentence due to the application of the career offender guideline. Ward conceded so at sentencing.

that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

Relying on *Blakely v. Washington*, 542 U.S. 296 (2004), Ward contends the district court erred in sentencing him as a career offender based on its factual findings regarding the first and third elements of USSG §4B1.1(a). He states that under *Blakely*, these facts were required to be submitted to the jury and proven beyond a reasonable doubt. Although Ward acknowledges that *Blakely* retained the exception for prior convictions,[10] he claims this exception was called into doubt in Justice Thomas' concurring opinion in *Apprendi*.[11]

Ward's objections to the PSR did not include an objection to the career offender enhancement. In particular, none of his objections included an objection based on the Sixth Amendment. Thus, we review for plain error. *Gonzalez-Huerta*, 403 F.3d at 730. As stated previously, to establish plain error, Ward must demonstrate there is "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 732 (quotations omitted).

Subsequent to briefing in this case, the Supreme Court decided *United States v. Booker,* 543 U.S. 220, 125 S. Ct. 738 (2005). In *Booker*, the Supreme Court extended its holding in *Blakely* to the federal sentencing guidelines, holding that the

---

[10] *See Almendarez-Torres v. United States*, 523 U.S. 224 (1998).

[11] *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

Sixth Amendment requires "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict [to] be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 125 S.Ct. at 756. To remedy the constitutional infirmity of the guidelines, *Booker* invalidated their mandatory nature, requiring the district court to consult them in an advisory fashion. *Id.* at 756-57 (severing and excising 18 U.S.C. §§ 3553(b)(1), 3742(e)).

In *Gonzalez-Huerta*, we determined there were two types of error a district court could commit prior to *Booker*. 403 F.3d at 731. The first, referred to as "constitutional *Booker* error," occurs when the district court relies upon judge-found facts, other than a prior conviction, to enhance a defendant's sentence mandatorily, a practice proscribed by the Sixth Amendment. *Id.* The second type of error, referred to as "non-constitutional *Booker* error," results when the district court applies the guidelines in a mandatory rather than advisory fashion, even though the resulting sentence was calculated based solely upon facts admitted by the defendant or found by a jury. *Id.* at 731-32.

The district court's findings regarding the fact of Ward's prior convictions did not implicate the Sixth Amendment. *United States v. Moore*, 401 F.3d 1220, 1223-24 (10th Cir. 2005).[12] Moreover, whether Ward's prior convictions constituted

---

[12] In spite of *Shepard v. United States,* 544 U.S. 13 (2005), *Almendarez-Torres* is still the law. *Moore*, 401 F.3d at 1224.

felony crimes of violence or controlled substance offenses under USSG §4B1.1 are questions of law unaffected by *Booker*. *United States v. Small*, 423 F.3d 1164, 1188 (10th Cir. 2005), *cert. denied*, 126 S.Ct. 1180 and 126 S.Ct. 1377 (2006). With regards to the district court's finding that Ward was at least eighteen-years-old at the time of the current offense, no Sixth Amendment violation occurred. At sentencing, Ward conceded the career criminal guideline controlled. Based on this concession, he implicitly admitted he was at least eighteen-years-old at the time of the instant offense. He also did not object to the PSR's factual statement that his birth date was May 4, 1977, rendering him twenty-five-years old at the time of the instant offense, and it appears he informed the probation officer of this date for purposes of preparing the PSR.[13]

Although no Sixth Amendment violation occurred at sentencing regarding the career offender enhancement, the district court committed "non-constitutional *Booker* error" based on its mandatory application of the guidelines. Consequently, the first and second prongs of plain error review are satisfied—there was error and the error was plain. *Gonzalez-Huerta*, 403 F.3d at 732. Under the third prong, Ward must show that the error affects his substantial rights, that is, "the error must have been

---

[13] In the "Personal and Family Data" section of the PSR, it states "Christopher Lee Ward was born on May 4, 1977, in Ft. Smith, Arkansas . . . ." (R. Supp. Vol. I, PSR at 10.) Other statements within this section were clearly provided to the probation officer by Ward. Although it is not certain that Ward provided the probation officer with his date of birth, such assumption is reasonable based on the context in which his birth date appears in the PSR.

prejudicial: It must have affected the outcome of the district court proceedings."

*United States v. Dazey*, 403 F.3d 1147, 1175 (10th Cir. 2005) (quotations omitted).

However, we need not decide whether Ward has satisfied the third prong of the plain

error standard because, even if he has, we conclude he has not met the fourth prong.

*See Gonzalez-Huerta,* 403 F.3d at 736 (concluding it was not necessary to determine

whether the third prong of the plain error test was met because the fourth prong must

also be satisfied to obtain relief and the fourth prong was not met).

"Under the fourth prong of plain-error review, a court may exercise its

discretion to notice a forfeited error only if it seriously affects the fairness, integrity,

or public reputation of judicial proceedings." *Id.* If "non-constitutional *Booker*

error" is involved, as here, the standard for satisfying the fourth prong is

"demanding"—the defendant must show that the error is "particularly egregious" and

that our failure to notice it would result in a "miscarriage of justice." *Dazey*, 403

F.3d at 1178 (quotations omitted). We have identified a number of non-exclusive

factors which may show that a defendant has satisfied the fourth prong:

> (1) a sentence increased substantially based on *Booker* error; (2) a
> showing that the district court would likely impose a significantly
> lighter sentence on remand; (3) a substantial lack of evidence to support
> the entire sentence the Guidelines required the court to impose; (4) a
> showing that objective consideration of the 18 U.S.C. § 3553(a) factors
> warrants a departure from the suggested guidelines sentence, and (5)
> other evidence peculiar to the defendant which demonstrates a complete
> breakdown in the sentencing process.

*United States v. Brooks*, 438 F.3d 1231, 1244 (10th Cir. 2006). None of these factors

-40-

are present here.

In particular, there is no evidence the district court would impose a significantly lighter sentence on remand. Indeed, the district court sentenced Ward to the top of the guideline range. In doing so, the court stated: "I am giving [Ward] the maximum under the guidelines, as I do believe he caused the death of two people." (R. Sentencing Tr. at 12.) Although the district court rejected the government's motion for an upward departure, it stated it "believe[d] the maximum sentence under the guidelines satisfactorily serves the purposes of punishment in this case and I do believe the defendant should be severely punished for a short lifetime but a lifetime of crime." (*Id.*) This statement indicates the court was satisfied with the sentence imposed and it would impose neither a lower nor higher sentence on remand. The court's statements also demonstrate that in imposing Ward's sentence, it considered the majority of the factors listed in 18 U.S.C. § 3553(a), including "the nature and circumstances of the offense," "the history and characteristics of the defendant" and the need for the sentence imposed to "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment" and "afford adequate deterrence." *See Booker*, 125 S.Ct. at 764 ("Without the 'mandatory' provision, the [Sentencing Reform Act of 1984] nonetheless requires judges to take account of the Guidelines together with other sentencing goals" contained in 18 U.S.C. § 3553(a).). Consequently, we decline to exercise our discretion to correct the error at sentencing.

2. USSG §2D1.1(b)(5)(C)

Section 2D1.1(b)(5)(C) of the sentencing guidelines provides: "If the offense (I) involved the manufacture of . . . methamphetamine; and (ii) created a substantial risk of harm to the life of a minor or an incompetent, increase by 6 levels. If the resulting offense level is less than level 30, increase to level 30." Ward argues the district court erred in enhancing his sentence under this guideline based on its finding that "his offense created a substantial risk of harm to the life of a minor." He claims this fact-finding violated his Sixth Amendment rights under *Blakely*. Ward also contends that if this factual issue had been sent to the jury, it would not have found as the court did because the jury found him not guilty of Shultz's murder. Thus, he asserts the jury would not have found him responsible for Long's death.

Although Ward objected to the USSG §2D1.1(b)(5)(C) enhancement in the district court, he did not do so based on the Sixth Amendment. Therefore, plain error review applies. *Gonzalez-Huerta*, 403 F.3d at 732. The district court committed constitutional *Booker* error because it mandatorily enhanced Ward's sentence under USSG §2D1.1(b)(5)(C) based on facts neither admitted to nor found by a jury. *Id.* at 731. That error was plain. *Id.* at 732. However, even assuming the error affected Ward's substantial rights, we decline to exercise our discretion to correct the error. This is so because the USSG §2D1.1(b)(5)(C) enhancement did not affect Ward's sentence. As he conceded at sentencing, the career criminal guideline controlled and resulted in an offense level of 34 even in the absence of the USSG §2D1.1(b)(5)(C)

-42-

enhancement.

3. Restitution

Ward argues the district court erred in imposing restitution because the applicable statute, 18 U.S.C. § 3663, only authorized restitution in this case to the alleged victim, Shultz, not her parents.  However, in a footnote, he clarifies he is not conceding that Shultz was a victim of the crime of conviction.  Ward also contends there was no evidence supporting the amount of restitution ordered. Lastly, Ward claims that because the court's restitution order enhanced his sentence, whether Ward caused a loss and the amount of that loss needed to be determined by the jury under *Blakely*.  We can readily dispose of the last argument.  Because restitution is not criminal punishment in the Tenth Circuit, *Blakely* and *Booker* do not apply to restitution orders.  *United States v. Westover*, 435 F.3d 1273, 1277 n.5 (10th Cir. 2006); *United States v. Visinaiz*, 428 F.3d 1300, 1316 (10th Cir. 2005), *cert. denied* 126 S.Ct. 1101 (2006).

We review the legality of a restitution order *de novo*.  *United States v. Osborne*, 332 F.3d 1307, 1314 (10th Cir. 2003).  The factual findings underlying a restitution order are reviewed for clear error and the amount of restitution for an abuse of discretion.  *Id.*  Section 3663(a)(1)(A) of the Victim and Witness Protection Act (VWPA) permits a court, when sentencing a defendant convicted of an offense under 21 U.S.C. § 841, to order "the defendant make restitution to any victim of such offense, or if the victim is deceased, to the victim's estate."  It defines "victim" as "a

-43-

person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." § 3663(a)(2).

In determining whether to order restitution under the VWPA, the court shall consider "the amount of the loss sustained by each victim as a result of the offense," "the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C. § 3663(a)(1)(B)(I). "The government bears the burden of proving, by a preponderance of the evidence, the amount of actual loss the victim sustained as a result of the offense." *United States v. Grissom*, 44 F.3d 1507, 1514 (10th Cir. 1995).

We conclude the district court erred in ordering restitution in this case. In *Hughey v. United States*, the Supreme Court held "the language and structure of the [VWPA] make plain Congress' intent to authorize an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction." 495 U.S. 411, 413 (1990). "Thus, a § 3663(a)(1) restitution order that encompasses losses stemming from charges not resulting in convictions is unauthorized by the restitution statute." *United States v. Wainright*, 938 F.2d 1096, 1098 (10th Cir. 1991). Here, Ward was acquitted of Shultz's murder. Based on our review of the

-44-

evidence, it appears this was due to the fact that even though Ward may have been manufacturing methamphetamine in the trailer, the jury could not find beyond a reasonable doubt that this conduct caused the fire and thus Shultz's death. Therefore, it was improper for the court to order restitution to Shultz's parents based on its belief that Ward was responsible for Shultz's death. The only restitution that could have been ordered in this case is for the loss caused by Ward's attempted manufacture of methamphetamine. The government did not attempt to prove any loss flowing from this conduct. Consequently, restitution was not appropriate.

We recognize that the guidelines permit a district court to consider a defendant's uncharged conduct, as well as conduct for which he was acquitted, in calculating the defendant's sentence. *United States v. Watts*, 519 U.S. 148, 154 (1997) (per curiam); *United States v. Moore*, 130 F.3d 1414, 1416 (10th Cir. 1997). Nevertheless, restitution is governed by the VWPA, not the guidelines. *United States v. Blake*, 81 F.3d 498, 506 n.5 (4th Cir. 1996); *United States v. Silkowski*, 32 F.3d 682, 688 (2d Cir. 1994). Indeed, USSG §5E1.1 authorizes a court to enter a restitution order to an identifiable victim "if such order is authorized under 18 U.S.C. § 1593, § 2248, § 2259, § 2264, § 2327, § 3663, or § 3663A, or 21 U.S.C. 853(q)." Thus, the fact that the district court could have potentially used its finding that Ward's manufacturing of methamphetamine caused the fire which resulted in Shultz's death to enhance his sentence or depart upward under the discretionary guidelines, the same finding cannot be used as a basis to order restitution when Ward

was acquitted of causing Shultz's death.

### III.  Conclusion

We AFFIRM Ward's conviction.  We REMAND to the district court with directions to VACATE its restitution order.  We AFFIRM Ward's sentence in all other respects.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge